In re the **MARRIAGE OF William W. POND**, Appellant–Petitioner,

and

**Brenda A. Pond, Appellee–Respondent.**

No. 02A03–9512–CV–442.

Court of Appeals of Indiana.

Feb. 24, 1997.

Transfer Granted July 17, 1997.

Brian J. T'Kindt, Robert L. Nicholson, Beckman, Lawson, Sandler, Snyder & Federoff, L.L.P., Fort Wayne, for Appellant–Petitioner.

Paul B. McNellis, Linda Peters Chrzan, Wyss, McNellis, Riebenack & Myers, Fort Wayne, for Appellee–Respondent.

**OPINION**

HOFFMAN, Judge.

Appellant-petitioner William W. .Pond appeals from the dissolution of his marriage to appellee-respondent Brenda A. Pond. William and Brenda were married on June 23, 1979. Their marriage produced two children: Gregory Clifford, born February 8, 1985, and Scott Everett, born March 2, 1988. William is a physician specializing in anesthesiology and is associated with Associated Anesthesiologists, Inc. as a practicing partner. During the marriage, Brenda, a licensed pharmacist, was not employed outside the home. However, in the spring of 1993, she began part-time employment with Keltsch Pharmacy.

On March 31, 1993, William filed a verified petition for legal separation. In an attempt to reconcile their differences, Brenda and William entered into a post-nuptial agreement relating to their property and the parties' respective rights and obligations in the event of a subsequent divorce.

The attempted reconciliation was unsuccessful. Thus, on November 15, 1993, Brenda filed her verified petition for dissolution of marriage. On April 15, 1994, William filed a petition for a declaratory judgment, pursuant to the parties' post-nuptial agreement, asking the trial court to rule on the validity of the agreement. The trial court heard evidence on September 2 and November 16 and 17, 1994. On January 13, 1995, the trial court issued its order upholding the validity of the post-nuptial agreement.

On January 23, 1995, Brenda filed a verified motion to reconsider. One week later, William filed a motion to compel compliance with the post-nuptial agreement. On Febru-

ary 10, 1995, Brenda filed a motion to correct error regarding the sale of the marital home.[1] The trial court did not rule on Brenda's motion to reconsider until it issued its final dissolution decree on September 8, 1995.

The final hearing on the remaining issues, the outstanding motions and the custody and child related issues, was held on March 7, 10, 16, and June 14, 1995. On September 8, 1995, the trial court entered its findings of fact and conclusions of law and judgment. In part, the findings provide:

7. Respondent, Brenda A. Pond, is employed as a licensed pharmacist with Keltsch Pharmacy in Fort Wayne, Allen County, Indiana, and the Petitioner, William W. Pond, is a physician specializing in anesthesiology and is associated with Associated Anesthesiologists, Inc. as a participating partner. Petitioner Husband's earnings are determined to be approximately $463,000.00, that being the average of his income for 1992, 1993 and 1994, respectively in the sums of $464,938.00; $506,436.00; and $417,276.00. That some evidence was presented respecting some circumstances which may impact upon his income, but which at the time of trial were so speculative as to provide no specific instance or circumstance from which the Court could conclude that his income would be so drastically affected that the average earnings of the Petitioner Husband should be diminished to the extent of the request made by him at trial.

\* \* \* \* \* \*

11. The Respondent Wife's approximate weekly earnings are $678.00.

12. ... The custody of the minor children is, therefore, ordered as entered to Respondent Wife with liberal visitation of the parties' minor children to the Petitioner Husband ... [.]

\* \* \* \* \* \*

21. Applying the relative earnings of the parties to the Indiana Support Guidelines, Petitioner Husband is ordered to pay the sum of $685.00 per week for the support of the minor children, retroactive to July 21, 1994. Inasmuch as Petitioner Husband provided support voluntarily at the rate of $500.00 per week during said period, he shall be given credit for the same but that with this order there is created an arrearage in the sum of $10,915.00, which he is ordered to pay to Respondent Wife within sixty (60) days from the date hereof.

\* \* \* \* \* \*

26. This Court has had under advisement the petition of Respondent Wife to reconsider the ruling dated January 13, 1995, wherein the Court upheld a Postnuptial Agreement between the parties dated August 14, 1993. The Motion to Reconsider was directed at rhetorical paragraph 25 of the Postnuptial Agreement requiring a party attacking the validity of the agreement to pay the attorney fees and costs incurred in the event the challenge was unsuccessful. *The Court reconsiders its former ruling and in determining that the Motion to Reconsider should be granted in part finds that in this instance, the clause requiring the Respondent to pay for the attorney fees incurred by herself as well as those incurred by Petitioner Husband in defending the Postnuptial Agreement is unconscionable. Inasmuch as the Court has broad discretion in the determination of the apportionment of attorney fees, the Court has determined that paragraph 25 of the Postnuptial Agreement as written would cause an economic impossibility to anyone but Petitioner Husband to challenge the agreement, but that the agreement as written was decidedly in favor of Petitioner Husband even though the Court has found that the agreement was valid.* The division of marital assets as provided in the agreement, for instance, would most decidedly not be the division if the division of assets was presented to the Court ab-

---

1. Paragraph seven of the post-nuptial agreement provided that if no buyer offered the listing price for the marital home, the home was to be sold to the highest bidder during the listing period. However, during the 180–day real estate listing period referenced in the agreement, William offered to purchase the marital home for $700,000, an offer which was $100,000 less than the lowest offer the realtor suggested that the couple accept.

sent such an agreement. There is no attempt in this order to rewrite the contract between the parties, but to give them a parity in determining the validity of an agreement which required many hours of preparation and in the presentation of evidence by both parties. Principally, the Court is concerned with the huge disparity of income between the parties and that by a ruling of this Court to require Respondent Wife to pay for the challenge which she made against the agreement would otherwise act as a deterrent only to her.

\* \* \* \* \* \*

30. Paragraph 7 of the Postnuptial Agreement provides that in the event of a filing of petition for divorce, the Abbey Hill real estate would be sold privately at a price agreeable to both parties or listed with an agreed real estate broker and offered for sale to the general public. The property was to be sold to the first qualified buyer who offered the listing price and if no buyer offer the listing price, then the property would be sold to the highest bidder during the listing period. The parties further agreed that the listing agreement would be for a period of not to exceed 180 days beginning when Petitioner Husband vacated the premises.

\* \* \* \* \* \*

34. The Court finds that the listing of 180 days was an incomplete listing within the spirit of the agreement provided by the parties and the Court, therefore, orders that the marital residence should be listed for a period of 180 days from the date hereof.

\* \* \* \* \* \*

36. On other matters pending before the Court, the Court has determined that the matter of spousal maintenance from Petitioner Husband to Respondent Wife should be granted as of July 21, 1994 at the rate of $250.00 per week creating an arrearage of $14,750.00 which Petitioner Husband is ordered to pay to Respondent Wife one hundred twenty (120) days from the date hereof. . . .

William now appeals the provisions of the trial court's dissolution decree relating to the validity of the post-nuptial agreement, the award of spousal maintenance, and the calculation of child support. Additional facts are supplied as necessary.

William raises four issues on review:

(1) whether the trial court erred by holding paragraph 25 of the post-nuptial agreement, requiring the party unsuccessfully attacking the agreement to pay the attorney's fees incurred, unconscionable;

(2) whether the trial court erred by awarding Brenda spousal maintenance;

(3) whether the trial court erred by not enforcing paragraph seven of the post-nuptial agreement requiring the marital home to be sold to the highest bidder during the listing period; and

(4) whether the trial court erred in its calculation of William's child support obligations.

■ Since the trial court made specific findings of fact and conclusions of law, we are bound to review them under the following standard: we must first determine whether the evidence supports the findings; we then determine whether the findings support the judgment. *Porter County Bd. of Zon.App. v. Bolde,* 530 N.E.2d 1212, 1215 (Ind.Ct.App.1988). The judgment of the trial court will be affirmed if we conclude that the special findings support the judgment and are not clearly erroneous. *ITT Indus. Credit v. R.T.M. Development,* 512 N.E.2d 201, 203 (Ind.Ct.App.1987). A judgment is clearly erroneous where a review of the record leaves us with a firm conviction that a mistake has been made. *Porter County,* 530 N.E.2d at 1215.

William's first contention, that the trial court erred in holding paragraph 25 of the post-nuptial agreement ("Agreement") unconscionable, is twofold. First, William argues that the trial court lacked jurisdiction to revise its earlier ruling that the Agreement was a valid and enforceable contract; second, he argues that paragraph 25 of the Agreement is not unconscionable. Specifically, paragraph 25 of the Agreement states: "In the event an attack by one party as to the validity of this agreement is unsuccessful, the

party initiating such action shall be responsible for all attorney's fees and costs incurred by both parties in the prosecution or defense of such action."

In support of his first argument, that the trial court lacked jurisdiction to revise its earlier ruling, William avers that Brenda's motion to reconsider, filed after the trial court issued its declaratory judgment order finding the Agreement valid and enforceable, was a reassertion of a previously denied motion. Pointing to Indiana Rules of Procedure, Trial Rules 53.3 and 53.4[2] concerning repetitive motions, William urges this Court that when Brenda's motion was not ruled upon within five days after filing, or 45 days after filing, if it was deemed a motion to correct error, it was automatically deemed denied. From this position, William then asserts that, since Brenda did not file a praecipe by April 11, 1995 to perfect an appeal from the declaratory judgment order, the order became final and was no longer subject to revision by the trial court.

■■■ Generally, declaratory orders, judgments, and decrees have the force and effect of final judgments and may be reviewed as other orders, judgments, and decrees. *Wendy's of Fort Wayne, Inc. v. Fagan,* 644 N.E.2d 159, 161 (Ind.Ct.App.1994); IND. CODE § 34-4-10-7 (1993 Ed.). However, the trial court has inherent power to reconsider, vacate, or modify any of its previous rulings so long as the case had not proceeded to judgment, i.e., the case is still *in fieri. McLaughlin v. American Oil Co.,* 181 Ind. App. 356, 358, 391 N.E.2d 864, 865 (1979); *Biggs v. Marsh,* 446 N.E.2d 977, 981 (Ind.Ct. App.1983). Black's Law Dictionary defines

*in fieri* as: "[i]n being made; in process of formation or development; hence, incomplete or inchoate. Legal proceedings are described as *in fieri* until judgment is entered." *Black's Law Dictionary* 778 (6th Ed.1990). A final judgment disposes of all issues as to all parties, to the full extent of the court to dispose of the same, and puts an end to the particular case as to all of such parties and all of such issues. *Hudson v. Tyson,* 178 Ind.App. 376, 380, 383 N.E.2d 66, 69 (1978).

Indiana statutory law provides that in an action for the dissolution of marriage, the court is required to enter a dissolution decree after determining that there has been an irretrievable breakdown of the marriage. IND. CODE § 31-1-11.5-3, 31-1-11.5-9 (1993 Ed.). The decree may include the disposition of matters such as property distribution. IND. CODE § 31-1-11.5-9. When a dissolution decree is entered, it becomes an appealable final order. *Id.*

■■■ Furthermore, a trial court has discretion to determine whether or not to accept a settlement agreement. *Atkins v. Atkins,* 534 N.E.2d 760, 762 (Ind.Ct.App.1989), *trans. denied.* The court should do so unless it determines that the agreement was the product of some unfairness, unreasonableness or manifest inequity in its terms or that it was procured through fraud, misrepresentation, coercion, duress, or lack of full disclosure. *Id.* A settlement agreement that has not been approved by the dissolution court and incorporated and merged into the decree has no legal efficacy. *Anderson v. Anderson,* 399 N.E.2d 391, 398 (Ind.Ct.App.1979).

**2.** Trial Rule 53.3 reads in pertinent part:
(A) **Time limitation for Ruling on Motion to Correct Error.** In the event a court fails for forty-five (45) days to set a Motion to Correct Error for hearing, or fails to rule on a Motion to Correct Error within thirty (30) days after it was heard or forty-five (45) days after it was filed, if no hearing is required, the pending Motion to Correct Error shall be deemed denied. Any appeal shall be initiated by filing the praecipe under Appellate Rule 2(A) within thirty (30) days after the Motion to Correct Error is deemed denied.
Trial Rule 53.4 reads in pertinent part:
(A) **Repetitive Motions and Motions to Reconsider Ruling on a Motion.** No hearing shall be

required upon a repetitive motion or upon motions to reconsider orders or rulings upon a motion. Such a motion by any party or the court or such action to reconsider by the court shall not delay the trial or any proceedings in the case, or extend the time for any further required or permitted action, motion, or proceedings under these rules.
(B) **Effect of Court's Delay in Ruling Upon Repetitive Motion or Motion to Reconsider Ruling on a Motion.** Unless such a motion is ruled upon within five (5) days it shall be deemed denied, and entry of service of notice of such denial shall not be required....

The Indiana Dissolution of Marriage Act, IND. CODE § 31–1–11.5–10 (1993 Ed.), encourages agreement by the parties as to the disposition of the marital estate. IND. CODE § 31–1–11.5–10(b) provides that the terms of a property settlement, if approved by the dissolution court, shall be incorporated into the dissolution decree. A property settlement that is incorporated into a final dissolution decree and order may not be modified unless the agreement so provides or the parties subsequently consent. IND. CODE § 31–1–11.5–10(c).

■ Here, William filed for legal separation in March of 1993. Thereafter, in an attempt to reconcile their differences, William and Brenda entered into a post-nuptial agreement. The reconciliation subsequently failed, and, in November of 1993, Brenda filed her dissolution petition. After William filed for declaratory judgment, seeking a ruling on the validity of the Agreement, the trial court issued an order upholding the Agreement in January of 1995. However, as was stated above, an agreement does not attain legal efficacy until the trial court accepts and incorporates it into the dissolution decree. The trial court did not issue the final dissolution decree until September 8, 1995. The instant proceedings remained *in fieri* until September 8, 1995. Thus, the trial court retained the power to reconsider its earlier ruling upholding the validity of the Agreement until September 8, 1995.

William also argues that the trial court erred in finding paragraph 25 of the Agreement unconscionable. In support of his argument, William relies upon *Ryan v. Ryan*, 659 N.E.2d 1088 (Ind.Ct.App.1995), *trans. denied* and *Flansburg v. Flansburg*, 581 N.E.2d 430 (Ind.Ct.App.1991), *trans. denied.* In *Ryan*, the wife challenged the trial court's determination that the antenuptial agreement was valid and the court's division of the marital estate in accordance with the antenuptial agreement. In affirming the trial court's decision, this Court found sufficient evidence to support the validity of the agreement where there was no evidence that either party was coerced to sign the agreement, or that the husband unduly influenced the wife or used his superior position to

convince her to sign the agreement. *Id.* at 1092.

In *Flansburg*, where the wife appealed a marriage dissolution decree claiming that the trial court abused its discretion in enforcing the post-nuptial agreement, this Court concluded that a "reconciliation agreement may be enforced as long as it is entered into freely and without fraud or misrepresentation, or is not otherwise unconscionable." *Flansburg*, 581 N.E.2d at 437. William also cites *Justus v. Justus*, 581 N.E.2d 1265,1278–1279 (Ind.Ct.App.1991), *trans. denied*, where this Court found that the trial court erred in finding the antenuptial agreement unenforceable as unconscionable and remanded the cause for determination as to whether the agreement was unconscionable; and *Rider v. Rider*, 669 N.E.2d 160, 164 (Ind.1996) for the proposition that unconscionability involves a gross disparity, and that a finding of unconscionability requires a comparison of the situations of the two parties.

The gravamen of William's argument appears to be that the trial court's findings do not support the conclusion that paragraph 25 of the Agreement was unconscionable. In support of this argument, William avers that Brenda sought and received the advice of five attorneys in the course of the preparation of the Agreement. William further bolsters his argument by emphasizing that the trial court concluded first that Brenda executed the Agreement voluntarily, and second that the terms of paragraph 25 of the Agreement were such that no sensible person, not under delusion, duress or distress would make, or that no honest and fair person would accept. William further points out that the trial court did not find that the enforcement of paragraph 25 would threaten Brenda's ability to provide for herself, and did not make any findings comparing the situations of the parties.

However, our supreme court has made a distinction between antenuptial agreements and post-nuptial (reconciliation) agreements. In *In re Marriage of Boren*, 475 N.E.2d 690, 695 (Ind.1985), the court stated:

> We find, however, that the distinction between antenuptial agreements, i.e., those entered into in contemplation of marriage,

and settlement agreements, i.e., those entered into as a consequence of dissolution proceedings, cannot be ignored and that the legislature, in enacting the Dissolution of Marriage Act, intended only to vest the trial court with discretion regarding post-nuptial agreements. The statute provides that the trial court may approve agreements entered into to settle disputes 'between the parties to a marriage *attendant upon* the dissolution of their marriage.' (emphasis added). The words 'attendant upon' refer to agreements accompanying, connected with, or a consequence of dissolution proceedings; they do not refer to those agreements made in contemplation of marriage which provide for the rights and obligations of the parties in the event of divorce or death.

*Id.*

In *Stockton v. Stockton,* 435 N.E.2d 586 (Ind.Ct.App.1982), husband and wife experienced marital problems after 26 years of marriage. The wife consulted her attorney, and a separation agreement was prepared by her attorney and signed by the wife and her husband. The agreement related to the division of marital property in the event of a dissolution of marriage. Approximately two months later, the wife filed her dissolution action. After hearing evidence on the action, the trial court entered a decree dissolving the marriage but reserved judgment on the property division. Thereafter, the trial court entered its supplement to the decree of dissolution of marriage rejecting the parties' property settlement and making an item by item division of the articles of personal property.

The question presented to this Court on appeal was to what extent, if at all, the court is bound by the parties' property settlement. In determining that the trial court did not abuse its discretion in rejecting the parties' property settlement agreement, this Court stated that:

> Thus, while the trial court is not required to approve a property settlement agreement automatically, but has some discretion in that regard, such discretion must be exercised reasonably and upon a rational basis supported by the evidence. The trial

court should not reject a property settlement agreement arbitrarily or based upon whim or because the court believes it could write a better agreement. Unless the record demonstrates some unfairness, unreasonableness, manifest inequity in the terms of the agreement, or that the execution of the agreement was procured through fraud, misrepresentation, coercion, duress, or lack of full disclosure, the court should not second-guess the parties, particularly where both are represented by counsel. For the court to reject or modify an otherwise fairly-entered-into and reasonable settlement agreement where no rational basis for such action is supported by the record would be an abuse of discretion.

*Id.* at 589–590. The Court further held that the record must support a rational basis for the court's rejection or modification of a property settlement agreement lest the court abuse its discretion. *Id.* at 590.

■ Here, the record reveals that William's average income for 1992, 1993 and 1994 was approximately $463,000. Brenda returned to the work-force in 1993 and had weekly earnings of $678. Based upon the huge disparity of income between the parties, the trial court determined that paragraph 25 of the Agreement requiring a party attacking the validity of the Agreement to pay the attorney's fees and costs incurred in the event the challenge was unsuccessful would cause an economic impossibility to anyone but William to challenge the Agreement. In so doing, the trial court specifically stated that:

> Principally, the Court is concerned with the huge disparity of income between the parties and that by a ruling of this Court to require [Brenda] to pay for the challenge which she made against the agreement would otherwise act as a deterrent only to her.

Here, the trial court did not reject paragraph 25 of the Agreement because it was dissatisfied with the Agreement. Instead, it found a compelling reason for finding the paragraph unconscionable. Consequently, we cannot say there was no rational basis for the trial court's action in finding the paragraph requiring Brenda to pay for the attor-

ney's fees incurred by herself, as well as those incurred by William, in defending the post-nuptial agreement unconscionable. Therefore, the trial court did not abuse its discretion in so doing.

William next argues that the trial court erred in awarding Brenda temporary spousal maintenance. The trial court, in its final dissolution decree dissolving the Ponds' marriage, ordered William to pay $250 per week during the period of the separation which amounted to an arrearage of $14,750. According to William, the trial court abused its discretion in awarding Brenda $14,750 in spousal maintenance because the post-nuptial agreement between the parties stated that "[e]ach of the parties hereby release and discharge the other party from all rights or claims that he or she has or may have against the other for the payment of temporary spousal maintenance or permanent spousal maintenance under the laws of Indiana or other jurisdiction [sic]."

■■■ The determination of temporary maintenance is committed to the sound discretion of the trial court. *In re Marriage of McDonald,* 415 N.E.2d 75, 79 (Ind.Ct.App. 1981). The trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Axsom v. Axsom,* 565 N.E.2d 1097, 1099 (Ind.Ct.App.1991). An abuse of discretion may also be found when the trial court misinterprets the law or disregards factors listed in the controlling statute. *Id.* On appeal, we will consider the evidence most favorable to the court's decision and will reverse only where the decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

As was stated above, the trial court is not required to approve a property settlement agreement automatically. IND. CODE § 31–1–11.5–10(b) empowers a court to approve, and consequently to disapprove, the terms of any settlement agreement.

■■■ In the present case, the evidence most favorable to the trial court's judgment reveals that in 1993, the year William filed for legal separation, William earned nearly $10,000 per week. William was also entitled to an additional $12,500 reimbursement for certain professional expenses. In the spring of 1993, Brenda began working part-time at a pharmacy and was earning approximately $678 per week. Prior thereto, Brenda did not work during her marriage to William. The trial court's award of temporary maintenance is amply supported by the evidence of the disparity in the parties' respective earning capacities. The trial court's temporary maintenance award to Brenda is not clearly against the logic and effect of the facts and circumstances; thus, the trial court did not abuse its discretion in deciding that Brenda was entitled to temporary spousal maintenance.

William next argues that the trial court erred by not enforcing paragraph seven of the Agreement which provided, in pertinent part, that the parties' marital home would be sold to the highest bidder during a listing period of not more than 180 days. The record reveals that during the 180–day listing period, William offered to purchase the home for $700,000. However, William's offer was rejected by Brenda because the listing price on the home had been $995,000 and the listing agent recommended that the parties accept a price no lower than $800,000.

■■■ In its findings incorporated into the dissolution decree, the trial court found that the original 180–day listing was incomplete within the spirit of the parties' Agreement and ordered the home listed for an additional 180 days. During the second listing period, the home was subsequently sold for $800,000. Because the house has been sold, William requests that this Court reverse the trial court's decision, enter an order that Brenda breached paragraph seven of the Agreement, and remand the case to determine the damages William suffered as a result of Brenda's breach of the Agreement.

Here, in its findings, the trial court further found that the listing agent was led to believe that the sale of the home would not be possible because of the pending legal action. As a result of the belief, the realtor was reluctant to show the home and estimated that at least half a dozen showings were lost.

Based upon the above, the trial court decided that the original 180–day listing was incomplete and ordered that the home be listed for an additional 180 days. It was within the trial court's discretion to disapprove paragraph seven of the Agreement and order an additional 180–day listing. We cannot say that the trial court abused its discretion by such an order.

William's final argument, that the trial court erred in calculating his child support obligation, is tri-fold. First, William argues that the trial court improperly included excludable business expenses and payments in his weekly gross income. Second, William argues that the amount of child support ordered by the trial court improperly deviated from the level set by the Child Support Guidelines. Third, William argues that the trial court calculated an arrearage based upon alleged payments by William of $500 per week, though there was no evidence presented regarding the amount of support William provided during the case.

William first contends that the trial court disallowed business expenses which were reasonable and necessary as contemplated by the Indiana Child Support Guidelines ("Guidelines"). William does not dispute the trial court's finding that his average income for 1992, 1993 and 1994 was $463,000. However, William does take issue with the following findings of the trial court: that he earned approximately $14,000 annually from his association with the United States Air Force as a part-time participant; that he was entitled to receive and has received approximately $12,500 reimbursement for certain professional expenses; and has "also received approximately $2,000.00 medical reimbursement for uninsured medical expenses, payment for medical malpractice insurance premiums of approximately $6,500.00 to $12,000.00 annually, [and] $5,000.00 for disability health care and life insurance, all of which may be added to his annual income which provides William W. Pond with a weekly gross income of approximately $9,600.00." William argues that the reimbursements he receives for professional expenses and medical malpractice expenses were ordinary and necessary expenses which

are properly deducted from the weekly gross income calculation under the Guidelines. Further, William asserts that because $10,-000 of the $14,000 he earned with the Air Force in 1994 was attributable to a signing bonus, the trial court erred in imputing the $10,000 as income to William in determining his weekly gross income.

 The preface of the Guidelines states that the Guidelines are consistent with the provisions of IND. CODE § 31–1–11.5–12 which governs child support. That statute outlines a number of considerations in the setting of child support payments, one of which is the financial resources of the non-custodial parent. Ind. Child Support Guideline 1. Evidence of a parent's net worth and assets are subjects of inquiry in a proceeding to establish or modify child support. *Merrill v. Merrill*, 587 N.E.2d 188, 190 (Ind.Ct.App. 1992).

Child Support Guideline 3 specifically addresses income from self-employment or operation of a business:

2. Weekly Gross Income from self-employment, operation of a business, rent, and royalties is defined as gross receipts minus ordinary and necessary expenses. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed in order that the deductions be restricted to reasonable out-of-pocket expenditures necessary for the production of income. These expenditures may include a reasonable yearly deduction for necessary capital expenditures. Weekly gross income from self-employment may differ from a determination of business income for tax purposes.

Expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business should be counted as income if they are significant and reduce personal living expenses. Such payments might include a company car, free housing, or reimbursed meals.

This Guideline clearly vests discretion with the trial court to scrutinize the self-employed parent's financial situation closely, and to exclude as a business expense any expendi-

ture which the court in its discretion finds will personally benefit the parent. *Merrill,* 587 N.E.2d at 190.

Here, the trial court found that William's reimbursements for professional expenses and uninsured medical expenses, as well as the payments he received for medical malpractice insurance premiums, disability health care, and life insurance constituted a personal benefit. The trial court is vested with the discretion to determine which sums constitute actual business expenses and which sums constitute benefits that reduce living expenses. The trial court concluded that the above-stated sums amounted to benefits that reduced William's living expenses and that the sums could be added to William's annual gross income. We find that the trial court's finding was supported by the evidence in the record.

In terms of the $14,000 earned from the Air Force, William's argument is not persuasive. During trial, William testified that the $10,000 signing bonus was paid for each of three years; 1994 was the last year that William was entitled to the bonus. Nevertheless, by including the earnings in William's weekly gross income, the trial court merely determined what William's average weekly income was at the time of the dissolution, and the $14,000 was in fact a part of that income. *See Wagner v. Wagner,* 491 N.E.2d 549 (Ind.Ct.App.1986) (where husband argued that trial court erred in considering $4,000 income tax return in determining his income, in that court presumed that he would receive the same refund in future years, this Court found that trial court merely determined what husband's income was at time of dissolution and $4,000 tax refund was in fact a part of that income).

Because the incomes of the parents are always subject to change, child support orders are subject to modification. IND. CODE § 31-1-11.5-17 (1993 Ed.). If William's income decreases in the future, he may petition the trial court for modification of the support order.

William next argues that the trial court improperly deviated from the Guidelines in establishing his child support obligation. The Guidelines and commentary indicate that the Guidelines are to be used in the context of a petition to determine or modify support. Ind. Child Support Guideline 4; *Boruff v. Boruff,* 602 N.E.2d 180, 181 (Ind.Ct.App.1992). The Guidelines create a rebuttable presumption that the amount of the award which results from their application is the correct amount to be awarded. Ind. Child Support Guideline 2; *Boruff,* 602 N.E.2d at 181. When a trial court chooses to deviate from the Guidelines, it must articulate a sufficient basis for doing so. Ind.Child Support Guideline 3; *Boruff,* 602 N.E.2d at 182. If the court concludes from the evidence in a particular case the amount of the award reached through application of the Guidelines would be unjust, the court shall enter a written finding articulating the factual circumstances supporting that conclusion. *Id.* These findings need not be especially formal. *Boruff,* 602 N.E.2d at 182. They must, however, set forth the trial court's reason for deviating from the Guidelines. *Id.* Moreover, child support exceeding the Guidelines may be ordered if supported by proper written findings justifying the deviation. *Kinsey v. Kinsey,* 640 N.E.2d 42, 44 (Ind. 1994).

In its findings, the trial court determined William's weekly gross income to be $9,600, and Brenda's weekly gross income to be $678 for a combined weekly adjusted income of $10,278. The Guideline schedule does not contain child support figures for combined weekly adjusted incomes of more than $4,000. When the combined weekly adjusted income exceeds $4,000, it is necessary to use the following formula to determine the basic child support obligation for the parties:

1.5 * ( {89.42443 * [natural log (combined weekly adjusted income) ]}—411.24)

Applying the above formula to the instant case, the basic child support obligation for the parties would be $622.56 per week. By dividing each parent's gross weekly available income into the combined gross weekly available income, assessing William's percentage share of income at 93% and Brenda's at 7%, and multiplying the percentage of share income by the basic child support obligation

($622.56), William's child support obligation would be $578.98 per week. However, in its findings, the trial court established William's child support obligation at $685.00 per week.

▇▇▇ Trial courts must avoid the pitfall of blind adherence to the computation for support without giving careful consideration to the variables that require a flexible application of the guidelines. *Talarico v. Smithson,* 579 N.E.2d 671, 673 (Ind.Ct.App.1991). However, when a trial court chooses to deviate from the guidelines, it must articulate a sufficient basis to do so. *Id.*

▇▇▇ In its September 8, 1995 order, the trial court stated that "[a]pplying the relative earnings of the parties to the Indiana Support Guidelines, Petitioner Husband is ordered to pay the sum of $685.00 per week for the support of the minor children...." However, the trial court's finding does not demonstrate how the application of the guideline amount would be unjust, unreasonable, or inappropriate nor articulate a reason for the deviation. The trial court failed to state any reasons for its action and this was error. We remand to the trial court with instructions to enter specific findings supporting its deviation from the presumptive award of child support.[3]

William next argues that the trial court erred in calculating an arrearage based upon alleged support payments by William of $500 per week because there was no evidence presented as to the amount of support William provided during the proceedings. William contends that he paid to Brenda cash in an amount in excess of $500 per week during the proceedings because he paid the mortgage on the marital home, insurance and medical bills for the children, and the bills issued for the credit cards used by Brenda to purchase items for herself and the children.

During the hearing determining the issues raised by William's declaratory judgment petition, William testified that, pursuant to the Agreement, Brenda would receive "a guarantee of continued paying for the house, the car, the insurance, plus she would get the $500 or $600 a week cash." During the same hearing, the following testimony also took place:

[Appellant's Counsel]: Ms. Pond, during the time of [sic] you testified regarding your employment, Doctor Pond was paying the mortgage, all the bills at the house, would that be correct?

[Brenda]: Yes.

[Appellant's Counsel]: He was providing you cash each week of approximately five hundred ($500) dollars?

[Brenda]: No, I don't believe so, but—

[Appellant's Counsel]: How much would you say that he was providing you?

[Brenda]: I really don't know. I was buying things for the boys. I didn't keep the records. He kept all the financial records.

\* \* \* \* \* \*

[Appellant's Counsel]: Doctor Pond, in furtherance of the agreement, started dividing the assets paid to you, ten thousand (10,000) from the life insurance policy, he paid you five hundred ($500) dollars a week, started to perform under the agreement, did he not?

[Brenda]: He gave me the check for ten thousand ($10,000) dollars.

[Appellant's Counsel]: He did not pay you five hundred ($500) dollars a week?

[Brenda]: I was withdrawing money from the bank machine just like I've always done before.

▇▇▇ Based upon the above testimony and the evidence presented at trial, the trial court determined that William provided $500 of voluntary support per week while the dissolution was pending. We are not persuaded that it was clearly erroneous for the trial court to have reached such a determination. There was no abuse of discretion.

---

**3.** William also argues that because the support amount was erroneous, the arrearage determination was also erroneous. However, because we remand the cause to the trial court for specific findings supporting its deviation from the guideline child support calculation, this issue need not be addressed unless the trial court determines that no findings exist to support deviating from the presumptive child support.

Affirmed in part, reversed in part and remanded.

GARRARD and RILEY, JJ., concur.